Good morning, Your Honor. My name is Robert Klein. I'm here to represent Brubaker Kitchens. I would just like to confirm, as I did with Ms. Lange beforehand, I will be presenting for eight minutes. And Mr. Emmerich, who is seated at the council table, is handling a different part of the argument. He is slated for seven minutes. However, we have confirmed with Ms. Lange two minutes off of that seven reserved for rebuttal. He's doing the rebuttal. Yeah, you can't both do rebuttal. I understand, Your Honor. But, Your Honor, we have two different parts of the argument. I'm not sure the Court understands this. If I could just clarify. Let me tell you that we have read the briefs. We are really known as a hot court. And you'll find that out when we question you. Very well, Your Honor. Your Honor, I'm focused on the summary judgment portion. Okay. And he's on the sanctions. That's correct. Okay, we understand that. Okay, so the two-minute rebuttal will be reserved for Mr. Emmerich. Okay. Thank you. Brubaker Kitchens. It's a company that is based in Lancaster, Pennsylvania, specializing. Yeah, we should probably skip that since you've got a relatively short amount of time. And we do know the facts. And I don't want to be too precipitous, but I definitely want to get you into what I think are the most pertinent issue, which is your assertion that you were denied discovery. You asked for discovery. You wanted discovery. You didn't get a chance to get discovery. And we spent some time looking at the record and I can't find where there's any record of your having, as you asserted in your briefing, having written to court and said, I need more time. Can you point us in the record to where that is? There is a section in the appendix, which I would have to rummage through briefly. I hope I can find it quickly to the correspondence that we exchanged with the court. Correspondence? Nothing. There's a rule that covers this. Did you file a Rule 56-F motion? Your Honor, we made a request. Did you file a Rule 56-F motion? Your Honor, in our brief in response to summary judgment, we did make a point. No, no. My question was very specific. We did not file a separate motion, Your Honor. Okay, Rule 56-F is there for precisely this purpose. And if you don't file a Rule 56-F motion, you haven't really preserved your claim that you needed more time for discovery. I appreciate that, Your Honor, and I respect the rules. We had a situation where judges' policies were told to us to be the overriding point. Now, with all due respect, next time I won't be put down this path, but there were policies and we were directed, both on the record and off. Which policies were you directed to, other than the written policy of the court? The judges' written policy, Your Honor, and it was also spoken to us. Didn't that say in no letters to the court on substantive matters? No, in fact, it did. Your Honor, I believe it said quite the opposite, that discovery disputes were brought to the court's attention through correspondence and a conference call would in turn be arranged. I could have to check that specifically. I don't mean to misquote it, but it was very widely understood by the counsel in the case that we were not to file discovery motions and we were admonished for doing so and we did. I thought there was actually, I read an exchange where you had said, I think we might need some additional discovery, and the court said, are you making a motion? And you said, I'm not making a motion. And the court said, in effect, well, if it comes to it, make a motion, but I'm not dealing with it now. That's the limit of what the record revealed, and so I'm puzzled about where you've got any support in the record for the assertion that we were telling them again and again, we've got to have discovery. I'm just not seeing it, and I'm giving you this chance now to point us in the record to where it is. June 29th hearing, Your Honor, I believe you may be referring to it. I don't mean to take liberty with words on it without having that transferred right in front of me, but I do remember it saying, and the record will bear me out, where I felt we had an issue, and discovery was also a concern because the court gave us an extension on June 3rd from May to July 14th, and discovery could not have been practical within that time period because we had new pleadings. We were just authorized by order of June 2. And, of course, at that point, if it's not practical in your view, you're at Judge Sloviter's point that you've got a way to deal with that, which is you say to the court via Rule 56F, we've got to have more time. Your Honor, if you might say I learned a lesson from the process, yes. However, I will have to say at the same time, we were given very strong direction, and it was widely understood, and we abided by it because it was very intimidating, quite frankly, to have to deal with a district judge who was very clear that he did not want these things on his documents. Well, no district judge in the country can require something when the rules specifically provide otherwise. You're not new to the bar. I am new to the bar. And I just – that's it. We have the transcript page. My law clerk found it. I guess it's 265. And he said exactly what Judge Jordan said. If it comes to are you asking for it now or are you – I'd raise it. Okay. And that's it. Okay. Yeah. You said, I think as a practical matter it will come up. The court said, okay, I'm not going to address that issue right now. If it becomes an issue, you have a case management order. I'm expecting to try this in October. I'm going to hold your feet to the fire. Your Honor, should we make an appropriate motion if it becomes an issue? Court, if it becomes an issue. But right now it's not an issue, right? And you say, I don't know. And he says, well, you just don't make it an issue, I think he's saying, by standing up here, but I'm interpolating. And then you comment, I just predict there are some variables here. And the court says, very well. So from that exchange, the only thing I can glean is you said, should I make a motion if it becomes problematic? And he said, fine, but I'm not dealing with it in the abstract. Mr. Kline, is that your principal objection to the summary judgment, that you didn't have discovery, enough time for discovery? Or do you have another objection? Thank you, Your Honor. We do. And what's that? Well, in the first instance, we take the position that the court did usurp the province of the jury by taking factual questions away from the jury that we thought that were very well-framed. We thought the facts in the case as they developed, definitely with respect to Mr. Shivenoff, warranted the matter going to the jury. What factual questions were they? Well, Your Honor, we felt that the point that was made in the summary judgment papers was about intent to harm and whether an element of malice or defined as intent to harm in the context of conspiracy was necessary. We argued not in the standpoint that we were really pressing breach of fiduciary duty, aiding and abetting breach of fiduciary duty, but even so, in conspiracy, we felt that we could meet that element of intent to harm by virtue of certain facts. What evidence in the record for the summary judgment motion did you put in to show malice or intent to harm on the part of Mr. Shivenoff? The diversion of customers, Your Honor. Well, what did he have to do with that? Well, he was personally involved in that before Brown and Gachnauer left Brubaker while they were still employed there. What evidence do you have of that? We had testimony of that, which we cited in our briefs, Your Honor. Tell us where the district court was wrong. The district court said, this is what you got. You've got one meeting over dinner where Mr. Shivenoff says, good for you, I'll give you business if you leave her, meaning Ms. Berkowitz and the Brubaker kitchen. You got a letter that says, to whom it may concern, we'll give these guys business if you give them financing in essence. Don't worry, we'll be giving them business. And you've got Ms. Berkowitz saying, I think he tried to lure my at-will employees away a couple, three years ago. Now that's, in the district court's mind at least, the extent of your evidence. Where is he wrong about that? What other evidence do you have? At the time, Your Honor, it was also in the record that Mr. Shivenoff was getting the opportunity to pick his price as part of the consideration or exchange for his service or help in getting these guys going. As the record would reflect, and obviously now I understand where you're coming from, relative to that 2000 business plan that Mr. Brown had on his laptop that was found at a late stage, that laptop having been ordered to be produced back in April, not given to us until September. But Mr. Shivenoff was the impetus of the plan. He was the man who basically needed this and was behind it. And as the record would have reflected, and I respect your points of view relative to the rules on this point, he did get caught in 2003. That was Mrs. Berkowitz's point. That was in the record. Obviously the 2000 business plan that we found in September through forensic computer experts. When you say he got caught in 2003, what do you mean? What's the record show? He was fired. He was terminated by Brule. Caught. Oh, I'm sorry. I thought you said caught. I misheard you. Caught. I'm sorry. I apologize. He did say caught. He said that. No, you're saying Mr. Shivenoff was caught. Caught. I'm sorry, C-A-U-G-H-T. All right. Pardon me. Then what do you mean by that? Then I don't understand. He was found to be – he had approached Mr. Brown and Mr. Gochnour to set up a competing business, to leave with him to set up a competing business. Rita Berkowitz found this out and fired him. What we know now is that that plan actually was already three years in discussion, at least. We did put into the record on summary judgment – 1121-A, 1121-B, and 1121-C and D. Those pages show that this operation was well underway as far back as 1999. So what – This operation being? Ivy Creek. The competing business. And when you talk in your briefing about Mr. Shivenoff being involved in Ivy Creek, you're – this is what you're talking about, that he had spoken to Brown and – how do you say the other gentleman's name? Gochnour. Gochnour. He'd spoken to them. Well, Your Honor, this is the trouble we had with the case. I don't understand his answer. On conspiracy. Circumstantial evidence sometimes is the best you can get, short of somebody turning on the other. In this situation, we did not have but for what we found in the computers, unfortunately, under these circumstances. What you found on the computers, was that presented to the district judge? It was through the process on sanctions, Your Honor. But not at the time of summary judgment, which is what you're addressing. We had an earlier version. No, the answer is no, right? Not the one that we found in September. That's correct. Okay. Aren't we limited to reviewing what was presented to the district judge? Except only if you would consider the discovery issue, which I understand your point. I think your time is up. Your Honor, thank you. Thank you. Good morning, Your Honors. My name is Frank Emmerich, and I represent Mr. Klein and Berkowitz and Klein as to the Rule 11 sanctions that were imposed by the district court in this matter. I'm here to reiterate that the court in sanctioning Mr. Klein and Berkowitz and Klein set up a very concerning standard to be used in Rule 11 proceedings. If you carefully go through his opinion, essentially what the district court is saying is to avoid Rule 11 and to avoid the imposition of paying of attorney's fees, a counsel who represents a plaintiff in a conspiracy case or any other case must have admissible evidence, hard core facts, concrete facts, as the district court said. Beliefs and reasonable suspicions are not allowed. It must be based on personal knowledge. And hearsay won't be permitted. And interviews. Where did the district court say hearsay couldn't form the basis of a reasonable factual investigation? In the second Rule 11 sanction. In the motion on reconsideration? Correct. On the motion on reconsideration, the judge points out that. Let's be specific. Why don't you show us where in this opinion you find this troubling standard? Because the hearsay statement thing, if I remember the reconsideration motion correctly, it was directed at relying on nothing more than a hearsay statement related by the client without further substantiation. That's how I understood it, but maybe I misunderstood it. Was there something else you were looking at? I think you're correct, Your Honor. As far as the hearsay statement is based on is that the district court said relying on a hearsay statement from the client, from an employee to the client, and then the client to the lawyer isn't sufficient evidence to bring a complaint. Wasn't it a double hearsay statement? Yes, Your Honor. It is a double hearsay statement. Somebody told the client that the defendants did something improper. Correct. A longstanding employee of the company told the CEO this is what happened. This is what they said. This is what they said. Now, if you think about that, I mean, you take that to the extreme. A client is always relying on various things. to go to an attorney to say I've been damaged and I need to bring a lawsuit is most likely relying on a controller or some accounting department to provide the information that, in fact, we were harmed. This standard laid out by the district court suggests that a lawyer to avoid Rule 11 would have to go interview the accounting department, and wherever the accounting department got information have to go there to kind of piece this all together. Or do something else, right, Mr. Emmerich? No, Your Honor, because what the district court actually said was and quoted cases for this proposition that it's not reasonable to do that when time permits further investigation, and there could have been some follow-up with the actual source of the comment made to Ms. Berkowitz. Now, your statements imply that this is new ground, but the district court cites a couple cases here that indicate that this isn't new. Well, Your Honor, if you're referring to this Southern Leasing Partners case and the Mike Gowsley production case that the district court cited, they were decided under the 1983 version of Rule 11, which just simply, well, actually had a higher standard as far as the factual basis, which was that the evidence before bringing a complaint would have to be well-grounded in fact. The 1993 amendments made a much more liberal rule in that in saying likely to have evidentiary support and likely to be able to establish support through discovery. So those two cases are distinguishable on those grounds, and frankly, the Mike Gowsley case is also disturbing the analysis because the court really starts looking at, after the fact, what did the attorney do after he pled the Rick Hogan, I believe the person's name was, into that case? What did the attorney do? And what the court said is you sued him, you didn't take any discovery on him, you had all these parties come and be deposed, and you never asked one question of them. I think the Mike Gowsley decision is wrong in looking at after the complaint. How do you address the district court's apparent concern that Mr. Klein filed an amended pleading after the TRO hearing at which, at least in the district court's impression it appears, Ms. Berkowitz made statements indicating she didn't know precisely what involvement, if any, Mr. Shibanoff had. Now, I think I'm recalling correctly how the district court characterized Ms. Berkowitz's statements. But in any event, it seemed important to the district court that there was an amended complaint filed after the TRO hearing. Absolutely, Your Honor. So what do you make of that? There's a couple of points there to be considered. One is no discovery. A motion for expedited discovery to deal with the injunction was filed ahead of that and was denied at that hearing. So no discovery had taken place from the filing of the complaint in December to that, I believe it was March 3rd or something like that for the TRO hearing. The other thing is the emphasis on the TRO hearing was misplaced because the TRO hearing dealt with whether there needed to be a restraining order imposed upon Gafneyer or Brown to stop them stealing employees. It had nothing to do with Shibanoff. And when you go through the provision or the sites that the district court lays out, when Mrs. Berkowitz is asked questions about Mr. Shibanoff's involvement and she goes to respond to those questions, which would be the answers that presumably would be similar to what she provided counsel in filing the complaint, that testimony was cut off both by Brown and Gafneyer's attorney and Mr. Shibanoff's attorney, if I recall correctly, on an objection that would be hearsay. The parties moved on because Mr. Shibanoff's involvement as far as this TRO proceeding would be concerned had no function. There was no reason to get into Mr. Shibanoff's involvement during the TRO hearing. So that testimony went on, and all you have is an objection to hearsay and Mrs. Berkowitz being cut off at that time. Tell us, if you can, about the effort to withdraw the complaint or dismiss the complaint with respect to Mr. Shibanoff. What's your understanding? And I gather your point is, look, you try to resolve this and they wouldn't accept it. And they say you wanted a quid pro quo. And did you want a quid pro quo? Tell us a little bit about that. Sure, Your Honor. What the record shows as far as the exchange of the voluntary dismissal is, first of all, as pointed out to the district court, the voluntary dismissal was in no way a concession that there wasn't enough evidence against Mr. Shibanoff. It was a strategic move at that point to deal with a lot of things. Number one is what you have is the key testimony or the key witnesses, everyone understood, was Mr. Laumann, the truck driver, who provided some of the foundation to bring Mr. Shibanoff in. After his deposition, which was attended by the... Could I stop you there? What did Mr. Laumann say about Mr. Shibanoff? Mr. Laumann, at his deposition, stated that he understood that there was going to be involvement, that Mr. Shibanoff was going to be a byproduct from Ivy Creek. What did not come across as strongly as was represented in pre-filing the complaint was the fact that there was a financial arrangement. Okay, so you find out that you don't have much evidence against Mr. Shibanoff to show that he had the requisite intent or conspiracy. You're not admitting that, but okay. So you were there, and then what do you do? What does Mr. Kline do? Well, it's actually Mr. Berkowitz attending that deposition from that law firm. Mr. Berkowitz, who is defending the deposition on behalf of Mr. Shibanoff, is Mr. Haverstadt. Mr. Berkowitz goes to Mr. Haverstadt at the end of that deposition and says, let's talk about dismissing the complaint. Now, didn't the district court make a finding of fact in this regard? I mean, the district court said, I heard Mr. Berkowitz's testimony. I heard Mr. Haverstadt's testimony. I don't credit Mr. Berkowitz's testimony. I do credit Mr. Haverstadt's testimony. Mr. Haverstadt's testimony is that Mr. Berkowitz said something to the effect of, what can we do to get rid of, quote, unquote, this, and that that was about the sum of it because Mr. Haverstadt said at that point, look, if you guys want to talk to Mr. Curley, do it. He's the guy who's got this case. And there's nothing else. According to the district court's fact finding, that's about it. Am I right? No, Your Honor. Okay, help me out. There's two things there. One is the district court reads in what Mr. Haverstadt's testimony is, which isn't there. Mr. Haverstadt testifies that he thought there was a quid pro quo, never said that, in fact, an offer or the suggestion by Mr. Berkowitz or Mr. Klein was ever, you know, if you give us this, a release or whatever, you provide testimony, we'll dismiss you. He thought it was a quid pro quo. Well, isn't the district court entitled to believe the testimony Mr. Haverstadt gives? I mean, Mr. Haverstadt is the guy who's in the conversation, and if he says from the context of this conversation, Judge, I understood they were saying if you want to settle, let's talk settlement. You know, we can make this go away if there's something flowing the other way. If that's his impression of what's being communicated by his longtime acquaintance, Mr. Berkowitz, why can't the district judge, who's the fact finder, say, I believe him? Because I don't think Mr. Haverstadt, when you read his testimony, actually says, he says, I thought that, and I understand what the court's getting at is that the court, district court can say that, in fact, happened. But then the secondary issues from that, Your Honor, is we'll accept for that purpose that Mr. Haverstadt comes out thinking there is going to be a quid pro quo, and that was the intent of Mr. Berkowitz. Okay? Accepting the district court's finding from there, is what the record then says is Mr. Haverstadt says, I'll talk to Mr. Curley. Okay? Nothing ever comes back. There's a follow-up between Mr. Berkowitz and Mr. Curley, and it's the recounting of Mr. Haverstadt being on a headset, you know, talking on the phone. And again, it ignores that request. And if you hear the request. Ignores what request? Ignores the request to even engage in a discussion about dismissal, because according to Mr. Haverstadt, and his testimony is, he thought that Berkowitz and Kline could go to the court by stipulation and take his client out, not understanding that Rule 41 would require a signed-off stipulation of dismissal by all parties. Did anybody, Mr. Kline, Mr. Berkowitz, anybody from the firm, say we want to dismiss this case and we'll need your signature to help us do that? Did they say anything even remotely like that or communicate it in any way? Well, a couple. You at least have the Mr. Berkowitz conversation after Allowman's deposition and the follow-up in the hallway conversation. Secondly, at the same time. Wait a minute. Wait a minute. I don't understand your response to that question. Are you saying that in those two instances, Mr. Berkowitz communicated what Judge Jordan said, i.e., we would like to dismiss this and we want your signature? The signature part, no. It was I want to dismiss your client. The signature part would come up. Okay. I want to dismiss your client. Was there any suggestion that there was something else that was expected? Did they say we expect him to testify or something like that? During those conversations, it never reached that level of detail. Okay. So what happened in those conversations? It was a request after Mr. Allowman's deposition by Mr. Berkowitz saying, we want to dismiss Mr. Shivenel. Mr. Curley's statement, I don't want to talk about that. I'm not the principal lawyer. I'll relay that to Mr. Curley. Mr. Halberstadt. I'm with you. Okay. Go ahead. So then what happened? There was no follow-up by Mr. Curley back, so there was follow-up then with Mr. Berkowitz again to Mr. Curley, let's dismiss. To Mr. Curley. I'm sorry. I did it again, Your Honor. I really apologize. Mr. Halberstadt. Okay. When was this? At that same conversation? No, this was, I believe it was a month later. It was certainly a separate, apart from the deposition. He said, let's dismiss. Let's talk about dismissing this client. And that's in the record? Yes, Your Honor. And does the district court talk about that? Yes, Your Honor. Okay. And what does the district court say about that? The district court, as Judge Jordan said, dismisses that saying, I believe Mr. Halberstadt and not Mr. Berkowitz. Well, did Mr. Halberstadt talk about that second, say anything about that second conversation? Yes. He testified that, in fact, Mr. Berkowitz had approached him again, and then he waved him off because he didn't want to deal with the case. Mr. Halberstadt didn't want to deal with the case. Correct. Because he was not the lead attorney, and he did not want to engage in those discussions. What I'm trying to find out is what's on the record with respect to an effort to dismiss. Go ahead. Right. What's on the record is the two conversations by Mr. Berkowitz to Mr. Halberstadt. And that's it? Correct, Your Honor. And there are different accounts of what was said and what was communicated, right? I disagree, Your Honor, because I think Mr. Halberstadt's testimony, again, just says he believes there was some quid pro quo. Okay. But there are, let's put it this way. Mr. Halberstadt didn't say what he said. Mr. Berkowitz has got it right. He gave a different account than what Mr. Berkowitz gave. Actually not. I mean, he would say that Mr. Berkowitz did, in fact, say that. Mr. Halberstadt says he read more into that. What rule of law do you want us to establish based on your position? Our position is to, excuse me, Your Honor, is to apply Rule 11, which talks about it has to be a patently frivolous and unmeritorious claim when it's fraud. And to appreciate the case law that, especially in a conspiracy case, you're never going to have that concrete, hardcore fact that the district court was asking for. You're not going to have that. These conversations happened outside the presence of Mrs. Berkowitz. She would only get the information through discovery. And the cases, as we pointed out in the brief, allow some deference, especially in a conspiracy case, to allow some factual development of the record. And unlike the Mike Galsley case that the district court relied on, in fact, the plaintiff here, through its law firm, Berkowitz & Kline, pursued questioning about Mr. Chisholm's involvement in this conspiracy. Do you want us to reverse the Rule 11 sanction or remand for the district court to reconsider it in light of something else? Your Honor, we ask that the court vacate the finding that the judge clearly applied an erroneous application of the law in applying the 1983 law standard of the law versus the current law, and also misapplied the facts. The difference between must and may, or shall and may. I know. I was on the Rules Committee, and I was responsible for that may. I have to tell you. So I know a little bit about that background. And the other big difference between the 1983 law and the 93 is the well-grounded in fact. I will concede to the court that under the 1983 standard, maybe the district court is correct that you need hard court facts under that standard. But the thing is, is in 1993, that standard changes. It's a much more permissive approach. Okay. I think we understand. Do you have more questions? No. I think we understand your position. Do you have any questions? No. I think we understand your position. Let's hear from Mr. Curley. May it please the Court, Charles Curley for the defendant, Mark Shivenoff. I'm here today to tell you Mark Shivenoff is exaggerated. The record, as you know, says that he owns a kitchen design company in Connecticut. And in 2003, he placed what amounted to effectively his last order ever with Brubaker Kitchens. And everyone admits that the job was botched. And since that time, other than save $1,000 order in an emergency situation, he never ordered for them again. Although he did know Brown and Gochnow. And in 2006, they told him that they were going to form their own company. And Shivenoff said, good for you. And Shivenoff said, if you form the company, I'll buy something from you. And then we refer to what we describe as the innocuous letter, which is certainly now the infamous letter, where Shivenoff, not in his individual capacity, which is glaring in my view, but on behalf of his company said, I'll commit to you. If you set up your company, we'll buy things for you. It certainly doesn't rise to the level of a binding contractual obligation, but I'll buy them. Well, Mr. Curley, you heard Mr. Klein argue that there was evidence in the record indicating that Mr. Shivenoff had some longstanding relationship with Brown and Gochnow. And his involvement was somehow deeper than mild encouragement. I guess I would like you to respond to that discussion of the record we heard from Mr. Klein. I heard him say that, but really the only record evidence that I recall on any of those issues was that Rita Berkowitz at her deposition said that in answer to a question, well, why do you believe that Shivenoff was involved? Oh, you have to know him. Well, tell me about that. Well, he was with us for a time in 1999 and then he left because we believed he was stealing Brown and Gochnow and had plans to steal them away. But the record also said in Shivenoff's deposition that he continued to be a customer of Brubaker Kitchens after a period of time that he left. So at one point he was a rep, not an employee, but a rep. And then after that he still bought stuff from them and presumably would have continued to buy things from them until they watched a job for him that was an important job in 2003. So what's interesting in the case is it's not even a situation where they even lost the business of Shivenoff, which you would more than likely expect to happen. They didn't even lose his business. So to suggest that the element that they're missing and that they need is there has to be something that a non-legitimate business interest for Shivenoff has to be motivated by his malice. And in fact, he could keep saying, and one of the things they planned, oh, he could demand his own price. Well, wouldn't that be great? Isn't that a legitimate business interest? Wouldn't he want to be able to have a lower price so he could make more money for his business? What strikes me is the fact that they sued him individually. There's nothing in the record that suggests anywhere that Mark Shivenoff individually did anything more than say that his company would buy something. Are you addressing the summary judgment or the Rule 11? I'm addressing the summary judgment. Well, I believe they're both hand-in-hand here. Okay, I would like to, if my colleagues don't mind, I'd like to turn to the Rule 11. That's fine. I call to your attention the notes, and these notes, I have to tell you, were approved by the committee. All the, I know. And the notes say, these subdivisions, this is, well, the 1993 amendments. These subdivisions restate the provisions requiring attorneys and pro se litigants to conduct a reasonable inquiry into the law and facts before signing pleadings. Then, and another part in the notes, they say, the certification that the attorney must put in is that there is, or likely will be, quote, evidentiary support, quote, for the allegation. Not that the party will prevail with respect to its contention regarding the fact. That summary judgment is rendered against the party does not necessarily mean, for purposes of this certification, that it had no evidentiary support for its position, et cetera. Now, my question to you is, did the district court correctly construe the purpose and the scope of Rule 11? Or wasn't the district court, as counsel says, really talking about the 1983 amendments, which were changed in tone, if no other way, in the 1993 amendments? Your Honor, I would say that the court took exhaustive steps to be certain that it was doing the right thing before it entered the Rule 11 sanction, having a hearing, taking testimony. That's the procedure, but what about the substance? What did the court believe, the district court, was the standard? I believe the court did apply the right standard. If the question is what did the district court think was the standard that an attorney was required to comply with in order to avoid Rule 11 sanctions? I'm not sure if I'm answering the question. Please interrupt me again if I'm not, but I... I will. So my thought is this, as to the answer to the question. We need a reasonable basis. The judge believed there was no reasonable facts that, forget whether he would prevail, forget whether or not he'd win a summary judgment motion, but what reasonable facts did he have? What he found was, and remember, the judge only related this back to the first amended complaint. At that point, we had four months of discovery, and at that point, all they had was a truck driver who they apparently did not even bother to talk to, and when we finally took his deposition... Well, he was on the road, they say. Right, he was too busy. Well, he was on the road. I guess if he was on the road, he may not have been around. Okay. You're right, but I think there's a situation where the judge can perhaps... make a ruling as to whether or not that's a reasonable investigation or not, nonetheless meeting the 1993 standard that Your Honor is pointing out. But those were the... The judge concluded that under those facts that he had, he had the president of Brubaker Kitchens answering testimony that she did not know, she just believed he was involved, and then the basis for her belief that he was involved was a single phone call that Mark Chivinoff wasn't even on. She trusted him, right? This was a long-time employee, you told her something. But she admitted in her deposition she didn't even follow up. The question was, what did he tell you? He said he was involved. Did you ask what he meant by he wasn't involved? Her answer was no. Well, what is a lawyer supposed... I mean, but the question is not whether summary judge... At least this question to me is not whether summary judgment was appropriately entered. What is this court going to tell lawyers is their obligation when a client goes to a lawyer and says, my people are leaving, they're taking my customers, I think these people... These are the two people who are leaving, and they're key people, and I think that they've got to deal with Mr. Chivinoff. Turns out there was no facts to support the Chivinoff. By the way, the other two people settled, isn't that right? It says. Did they give money? I don't know, Your Honor. I don't say that glibly either. I believe that there was a settlement, and in my understanding there was a confidentiality agreement, so I wouldn't know. Was the settlement approved by the court? I don't know. Because there's an opinion outstanding from this circuit that says if the settlement's approved by the court, that it's not confidential anymore. I know, I wrote it. Honestly, I don't know. Okay. Well, anyway, so at least the two of them settled, and I'm still trying to figure out what is a lawyer supposed to do? Is a lawyer supposed to cross-examine the client when the client comes and says this is what's happening? I think, Your Honor, I think in this case, and Judge Sanchez gave the attorneys an opportunity to answer that question, what did you do? What did you know? What did you have before you filed that First Amendment complaint? And frankly, and you see the record, it's important to say nothing. Well, they had their client's statements to them. Right, and the fact that they said it. What I'm trying to find out is between the lawyer and the client, what is a lawyer supposed to do? I think that a modicum of that would be relying on what we've now said was double hearsay. So I think at least at a minimum we could say there may be a case, Your Honor, where you say, I think the lawyer did enough, but not here. Not on the double hearsay situation. The double hearsay is that, is it Loughman or Loughman? Loughman. Mr. Loughman says they were involved. Was there something more than they were involved? Mr. Loughman says Mr. Shibanoff's involved. That was it. That's it. So it's double hearsay that Mr. Shibanoff is involved. And I guess we'll hear from the other side on this point, but was that the entirety of Mr. Loughman? Even if you accepted the double hearsay is not a problem, which it may not be when you're talking about investigation under some circumstances. But the statement itself, accepted at face value, he's involved, was that the limit of the basis for the charge, the complaint? There were two follow-up questions at Loughman's deposition. What did he mean by involved? He said, I don't know. Was it a financial involvement? And he said, no. I don't even think they had that information because they didn't even bother to talk to the charge. Well, should they? That's what I'm trying to find out. What do we tell lawyers? That when they file a complaint, they have to do discovery of the possible witnesses before they file a complaint? I'm just trying to find out. The bar is going to want to know what we're doing. I think here if we follow that record, we'll see that the judge, and I believe he should have taken it all the way back and realized we asked for sanctions all the way back to the original complaint. But the judge only said back to the first amended complaint, by which time he'd already had four months. Why didn't you accept the offer to dismiss? There was no offer to dismiss. Well, why didn't you accept the let's talk about dismissing? I was always willing to talk about dismissing. Did you call them back? When somebody said, I have to talk to Curley, who's in charge of this, did you call them back and say, yeah, we'll dismiss? Go ahead and dismiss. Let's get rid of Shivenoff? I always wanted to have an answer to Your Honor's question. Here's why I'm struggling to answer your question. Did I call them back? I didn't get the understanding from Mr. Howard that Jerry Berkowitz wants you to call him without dismissing Shivenoff from the case. So you never were, so you're telling us you never received any information that they were interested in dismissing Shivenoff? That's what I understand you to tell us. And the answer is not unconditionally. Well, what was the condition and how did you get the conditional information? The series of events is the following. I actually wrote to Mr. Kline. I said, let's let Shivenoff out of this case. There's no merit to it. He wrote back and said, a week or so later, wrote back and said, these are the conditions, and he listed it. It's still on the record. Then there was a conversation, apparently, between Berkowitz and Halberstadt. I may have this part wrong. And Halberstadt was on your side and Berkowitz was on the other side. Right. Okay. And so in my mind, there's these conditions out there. And what were the conditions? It was to cooperate in the litigation. I mean, there must have been ten of them. It clearly wasn't. It was not an unconditional offer. Agreed. And another thing was, quite frankly, there was a release here. And as I started to think, Mr. Shivenoff is exasperated. I don't know if I'm going to ask him for a release to release them from the claim. But nonetheless, it was not an unconditional offer. Isn't a release usual at the time of a dismissal of a party? No. I mean, it's a long time since I've practiced law, so I'm not sure. I can see certainly you'd want to ask for it, but it's not required. I mean, even this idea of the stipulation. But is the request for a release unusual? No. No. Okay, go ahead. So at a certain point, what's interesting is at a certain point, when that conditional offer to withdraw the action was then withdrawn from me. Why? What happened in between? It was following Rita Berkowitz's deposition, which I thought should have been the end of it. There was a withdrawal of the conditional offer. And then when I filed the Mushroom Summary Judgment and the Rule 11 motion, as if on a dare is what I wrote in my paper, they filed a second amended complaint, and this time they named Shivenoff's partner individually, Shivenoff's company individually. All accounts again. This is not a situation where, hey, we're trying to settle with you. This is the part that I'm sure Judge Sanchez could not believe. We're trying to settle with you, but I just filed a motion for leave, which I contested, because I thought there was no merit to it. He had to file a motion for leave to file a second amended complaint, and I contested it. And why wouldn't he tell the judge, I'm actually trying to get Shivenoff out of the case? This is the part that's unbelievable. Well, we've seen a lot of unbelievable things. We believe anything. Well. Tell me one more question, if my colleagues will permit. We heard from the other side that the judge said somewhere that you needed some hard facts or something. Is that, is that, I can't find it. Is that what the judge said in his, I'm looking for it. Is that your understanding of what the judge said? Before you can. Honestly, Your Honor, I do not recall, although my answer would be there weren't even soft facts. No, I just want to know what was the judge's standard, because that's what we're reviewing. Right. Well, I. Was that not your, you've read this pretty carefully. I certainly haven't. I was present as well. Okay. Well. Okay. We'll hear the rebuttal. Thank you, Mr. Curley. Thank you very much. Where is the hard facts that you've told us about or something like that? The hardcore facts. Yeah. Where does that appear? I'm scrambling. It is actually cited, I believe, in bold in our brief. The, that, that colloquy between the district court and, and the, Mr. Klein at that point, because that's, this was during the original. Sir, anything in, in the opinions that the court rendered that says that. I mean, you ought to know that if that's what you're claiming. Yes, Your Honor. I mean, the court comes out and says. You should come here prepared to answer that question. Yeah. It should be. The judge lays out in his opinion that there needed to be something more than beliefs. And I believe he does still cite the hardcore facts language. Yeah. Well, I'd love to see that. I think that's what we're asking you. I'm looking at the rule 11 brief. I mean, this is a different case if the judge used the wrong legal standard than if the judge used the right legal standard. And all we're trying to do is find out from you. Oh, here it is. You say. Page 58. 59. Yeah, you say. Indeed, the court insisted BNI had to have hardcore facts. Now, where is the record support? The sanctions hearing at the trial trans, the first sanctions hearing at page 39. The district court says you're asking somebody to defend in a civil lawsuit. And this is on page 58 of our brief. Okay. A civil lawsuit. So outline the facts for me. Not beliefs, but facts. Hardcore facts. All right. What are they? Okay. Now, where does it in the judge's opinions where he says, where he lays out what the standard he's applying is and why he's applying it, where is the support that he was laboring under a misconception about what the standard was? Well, he talks about on page 12 of the second opinion, the December 11th opinion. Right. And he talks about substantiated allegations. Okay. And he goes through and then he talks about how he can discredit Rita Berkowitz's testimony because it's double hearsay. I'm on page 12. On page 12, the first full paragraph, Your Honor. At the end of it, it says, you know, the only substantiated allegation against Shivenoff. I must be looking at the wrong one. Are you sure that you're looking at the December 11th one? Because the end of the first full paragraph is talking about numbers. I'm sorry, Your Honor. No, it is the December 11th, 2006 opinion. The paragraph begins, while I agree my order granting sanctions should not be based on transcripts. Okay. All right. That's page 4. It's page 12 of the appendix. All right. I apologize, Your Honor. It talks about the only substantiated allegation. It goes on to talk about how Mrs. Berkowitz's statements are mere hearsay, that it was speculation on the next page to include Berkowitz as a, or Shivenoff as a partner in this conspiracy. Okay. Was the judge, when he talked about no hardcore facts, was he referring to the testimony that the truck driver said Shivenoff was involved? No.  Wasn't that her testimony? At the TRO here. Oh, I see. I see. But I'm talking about before the complaint was filed. What were the facts? Before the complaint was filed, what was facing Mrs. Berkowitz and presented to Mr. Klein was, one, it's a well-trusted client. We can't dispute that. It's the wife of 30 years of Mr. Klein's law partner. Two, she's claiming conspiracy. Her two highest employees have left the company. Three, she knows that Shivenoff had prior to that date tried to take these two individuals, Gachnauer and Brown, and start a company. Excuse me. Number three, she knows that Shivenoff is a competitor. He still used occasionally some Brubaker product, but he was not essentially using her for many years. Two, they have a private investigator go out that know at the time that Brown and Gachnauer left. Go ahead. Keep on going. Okay, that Brown and Gachnauer left, that they already had a warehouse, they already had orders. That shows a, if anything, it shows a conspiracy, if you want to use that word, as to Brown and Gachnauer. Did the private investigator come back with any information on Shivenoff? The private investigator, no. But in using, again, the conspiracy that you're going to have to start with circumstantial evidence, is that they had to have finance. We knew what they were paying for. Well, but you're not in a conspiracy if you're fine. I mean, is there anything wrong with financing a new competitor? Yes, because at this point is if, in fact, they were financing it, again, a circumstantial approach to this pre-complaint would be that Mr. Shivenoff knew that Mr. Brown and Mr. Gachnauer had fiduciary duties. This isn't pre-complaint, though, is it, Mr. Emmerich? At this point, as your opposing counsel has pointed out, the judge is starting to measure this from a First Amendment complaint. What did you know at the stage of the First Amendment complaint? Nothing had changed, Your Honor. It was about a period of two and a half months from the filing of the original complaint and the amended complaint. As the record says, and it argued in the brief, expedited discovery. The request for that was denied. So no discovery had taken place between the original complaint and the First Amendment complaint. Is there any inference to be drawn, as your opposing counsel implies there should be, about the good faith with which this litigation was pursued from the fact that a second amendment, leave to file a second amended complaint was presented, a request for that was presented to the district court? No, because what happened immediately before filing the second amended complaint was at that point the discovery of the business plan by Brown and Gachnauer, which mentions Shivenoff, and as well as the phone records that show that, in fact, during their employment with Brubaker, Gachnauer and Brown, were having regular phone calls with Shivenoff, which again would not be expected because he was not a regular customer of Brubaker at that point. What do you understand is a lawyer's obligation under Rule 11 before filing a complaint? What kind of investigation is a lawyer obliged to undertake? First, a legal review of what the law is and what the causes of action, and I don't believe that's an issue in this appeal. So then we go to the facts. What facts support that claim? A lawyer has to sit down. A, they have to have trust in the client. A client that comes in that gives an appearance of untrustworthiness, a lawyer's got to think. Under Rule 11, the cases say it's a stop-and-think rule. In that situation, they've got to stop and think. If that burden's met here, it's a longstanding claim. At that point, a lawyer needs to sit down and understand what evidence is out there and what can I do to confirm that pre-complaint, and not every single piece of evidence. You're not going to prove your case or try to find the admissible evidence, every single piece of it, before lodging the complaint, especially in this case where, again, it starts out as an injunction matter. Did Judge Sanchez ever say you've got to have admissible evidence? Did he ever even imply you have to have admissible evidence? Give me a quote, if you can, where he says or implies that the standard he's imposing is, I expect people to have admissible evidence in hand before they file a complaint. Again, Your Honor, I'd go back to the discussion that begins on his opinion at 3 through, where he's, again, talking about only substantiated allegations, only hearsay. You're talking about the October opinion or the December opinion? I think he's looking at the December one. The December one is not at the back of the blue brief, is it? It's not at the back of the blue brief. Oh, yeah, go ahead. I'm sorry. Go ahead. Yeah. Okay. Okay. I got you. Thank you. I think we understand. All right. Thank you, Your Honor. Okay. Thank you. Are you satisfied? Yeah. Thank you, Counsel. Thank you. We'll hear, as soon as they're, you're finished. Thank you. We'll hear counsel in Rieros, the Rieros brothers.